UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHNNY CHRISTIAN,

    Plaintiff,

v.

                                              Case No. 8:19-cv-1048-T-MAP

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____/

## ORDER

This is an appeal of the administrative denial of disability insurance benefits (DIB), period of disability benefits, and supplemental security income benefits (SSI).[1] *See* 42 U.S.C. § 405(g). Plaintiff argues that the Administrative Law Judge ("ALJ") failed to fully develop the record. After reviewing the record, I find the ALJ's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is reversed, and remand is necessary for the reasons set forth below.

    *A.  Background*

Plaintiff Johnny Christian, who was fifty-two years old on his alleged onset date of June 1, 2014, has a high school education.[2] After working for thirty-three years as a cable television installation helper (R. 45, 516), his job ended and he became unable to work due to mental

---

[1] The parties have consented to proceed before me pursuant to 28 U.S.C. § 636(c) (doc. 14).

[2] At the ALJ's hearing, Plaintiff's counsel mentioned amending the onset date to June 22, 2016, his fifty-fifth birthday (R. 44). However, neither the ALJ's decision nor Plaintiff's memorandum of law reflects an amended onset date.

problems. The record describes Plaintiff as a "poor historian" who has used and abused alcohol and cannabis and has had suicidal and homicidal ideations requiring multiple Baker Act hospitalizations for mental stabilization (R. 346-47; 706). His troubles started in childhood: he reports being sexually and physically abused as a child, and that he took his first alcoholic drink at the age of six (R. 347, 359). Plaintiff's diagnoses include depression, schizoaffective disorder, and polysubstance abuse, resulting in his inability to work.

The Commissioner denied his claims both initially and on reconsideration. Plaintiff then requested an administrative hearing. Per his request, the ALJ held a hearing on March 3, 2018. At that hearing, Plaintiff appeared with an attorney and testified regarding his condition. He testified he was homeless and lived at a tire store owned by his friend Doug who paid him $30 a day twice a week to "move junk tires" (R. 49, 706) Plaintiff explained that he no longer had health insurance and thus had been unable to continue his mental health treatment at Gracepoint where he had received monthly injections (R. 46). Without insurance he also was unable to obtain treatment for his back and foot problems (R. 47-48). Pointing to this lack of insurance and lack of recent medical treatment, Plaintiff's counsel requested that the ALJ order updated consultative examinations and physical capacity assessments (R. 44).

After the administrative hearing, the ALJ issued a written decision denying Plaintiff's claim. (R.10-20). The ALJ found that Plaintiff suffered from the severe impairments of depression, bipolar disorder, schizoaffective disorder, and alcohol and substance abuse disorder (R. 12). He also found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments (R. 13). Instead, the ALJ determined Plaintiff retained the residual functional capacity (RFC) to perform a wide range of work at all

exertional levels but with the following non-exertional limitations:

> The claimant is limited to unskilled work SVP 1 or 2, simple, routine and repetitive tasks. The claimant is limited to occasional interaction with supervisors, co-workers, and the public and only occasional changes in the work setting.

(R. 15). Based on the testimony of the vocational expert and Plaintiff's age, education, work experience and RFC, the ALJ concluded there are jobs that exist in significant numbers in the national economy that the claimant can perform (R. 19). Specifically, he found Plaintiff could successfully perform the requirements of kitchen helper, vehicle washer/ detailer, and hand packager (R. 19). Plaintiff has exhausted his administrative remedies and filed suit in federal district court. This case is now ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

### B.  *Standard of Review*

To be entitled to DIB and/or SSI, a claimant must be unable to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *See* 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Social Security Administration, to regularize the adjudicative process, promulgated detailed regulations that are currently in effect. These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a)(4). Under this process, the Commissioner must determine,

in sequence, the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment(s) (*i.e.*, one that significantly limits his ability to perform work-related functions); (3) whether the severe impairment meets or equals the medical criteria of Appendix 1, 20 C.F.R. Part 404, Subpart P; (4) considering the Commissioner's determination of claimant's RFC, whether the claimant can perform his past relevant work; and (5) if the claimant cannot perform the tasks required of his prior work, the ALJ must decide if the claimant can do other work in the national economy in view of his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4). A claimant is entitled to benefits only if unable to perform other work. *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); 20 C.F.R. § 404.1520(f), (g).

In reviewing the ALJ's findings, this Court must ask if substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The ALJ's factual findings are conclusive if "substantial evidence consisting of relevant evidence as a reasonable person would accept as adequate to support a conclusion exists." *Keeton v. Dep'markt of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citation and quotations omitted). The Court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds the evidence preponderates against the ALJ's decision. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Keeton*, 21 F.3d at 1066 (citations omitted).

C. *Discussion*

Plaintiff's single-issue memorandum of law focuses on the ALJ's failure to develop a full

and fair record due to his failure to order updated consultative physical and mental examinations in light of Plaintiff's inability to afford medical treatment since approximately December 2016. While I agree that updated consultative examinations may be useful, I must address other related deficiencies first.[3]  Although there is no requirement that the ALJ specifically address every piece of evidence, the Court must be able to conclude that the ALJ adequately considered a claimant's medical condition as a whole.  *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).  Review of the administrative record shows that the ALJ failed to discuss pertinent evidence during the relevant time frame.  The ALJ failed to discuss a large portion of the records from Gracepoint, a mental health and substance abuse care center, concerning Plaintiff's mental health, including outpatient notes and opinions of treating psychiatrist Mary Sheehan, and mischaracterized opinion evidence from the two state agency psychologists.  Due to these problems, I find the ALJ did not consider Plaintiff's medical condition as a whole.  As a result, it is impossible for the Court to determine whether substantial evidence supports the ALJ's decision.

Specifically, while the ALJ discussed Plaintiff's treatment at Gracepoint in February, March, June, and December of 2015, he failed to consider the vast majority of Plaintiff's treatment at Gracepoint throughout 2015 and 2016.  The Gracepoint records depict Plaintiff's serial admissions for mental stabilization, including three admissions in a row in July 2015.  On June 30, 2015, Plaintiff verbally threatened doctors at Tampa Community Hospital, stating he would fight them if they touched him and commenting that he wanted to take pills to kill himself. Finding a substantial likelihood that without care or treatment Plaintiff would cause serious bodily harm to

---

[3] I note that Plaintiff's insured status expired on December 31, 2016.  Thus, consultative examinations ordered by the ALJ in early 2018 (around the time of the ALJ hearing) would have limited value regarding Plaintiff's status during the relevant time frame.

himself, he was Baker Acted and transferred to Gracepoint (R. 601). Treatment notes from July 1, 2015, indicate Plaintiff was not cooperating and did not want medication. Mental status examination showed a dysphoric mood, constricted affect, speech characterized by "poverty of thought," decreased psycho-motor, auditory hallucinations and suicidal ideations, poor eye content, insight and judgment (R. 604). Not long after his stabilization and discharge, on July 18, 2015, Plaintiff was Baker Acted again for making statements that he wanted to set a house on fire so he could see how fast people could get out, that he wanted to kill himself because he does not care anymore, and that he wanted to kill others because he thought it would be fun (R. 408). The mental status examination described his "attitude and behavior show[ing] signs of being bizarre," "mood is depressed and angry," "affect is depressed and angry," "speech tangential and loud," "thought process is paranoia and rumination," "thought content is preoccupation and suicidal ideations and homicidal ideations and delusions," and "insight is poor … judgement [sic] is poor" (R. 409). On July 22, 2015, he was again admitted to Gracepoint. The evaluation indicates he acknowledged making threats to himself and his family, but denied suicidal or homicidal ideations and said he did not need medication (R. 442). On July 24, 2015, Plaintiff arrived at Gracepoint voluntarily and took a handful of prescription medication in the lobby in front of the staff (R. 449). Thereafter, on July 29, 2015, when Plaintiff presented for an outpatient aftercare appointment, he tried to grope the breasts of a female patient and stated he planned to take all the pills in his backpack. He poured the contents of three bottles of psychotropic medications into his hands and prepared to swallow them. He stated he wanted to end his life because he was raped as a child and threatened to punch doctors, staff, the police, and anyone who got in his way (R. 483, 675). Gracepoint records indicate that the July 31, 2015 admission was Plaintiff's eighth Gracepoint

admission (R. 476). Finally, before his August 2 discharge, Plaintiff agreed to take monthly injections of Invega Sustenna to control his mental health symptoms (R. 489, 672).[4]

In addition to these inpatient Gracepoint records concerning admissions after suicide attempts or threats of violence, the administrative record contains outpatient psychiatric records from Gracepoint dated August 2015 through December 2016 that the ALJ did not discuss in his decision. During this time, Plaintiff treated seven times with Dr. Sheehan and twice with Alicia Parks ARNP. Dr. Sheehan's August 13 treatment note describes Plaintiff's improvement as a result of the Invega Sustenna treatment. He no longer exhibited suicidal or homicidal ideations, but his thought content remained "paranoia" and insight and judgment fair to poor (R. 546). Dr. Sheehan described Plaintiff as "exhibiting signs of anxiety/ PTSD and mania and psychosis, as evidenced by unspecified anxiety, decreased need for sleep, flight of ideas/ racing thoughts, being easily distracted, an increase in goal directed activity, excessive risk behaviors, expansive mood, paranoia. The client is exhibiting signs of abusing ETOH/ Sedative abuse, as evidenced by ignoring of physical symptoms" (R. 546). Dr. Sheehan's November 3, 2015 note is similar: Plaintiff reported no suicidal thoughts for past two weeks, he felt that the Innvega Sustenna injection had heled his mood, and he had been able to accomplish several things by himself over the past few weeks (R. 698). And the November note indicates he was drinking less (four 24-ounce beers a day down from 12 32-ounce beers a day), smoking less (one and a half packs compared to two packs a day in past), and no longer using drugs. However, he still accused family

---

[4] Invega Sustenna (paliperidone palmitate) is a long-acting prescription medicine given by injection by a healthcare professional to treat schizophrenia. It is an atypical antipsychotic medication that is gradually released to control symptoms of schizophrenia and reduce chances of symptoms coming back when given monthly. *See* invegasustenna.com (April 1, 2020).

members of stealing from him, appeared paranoid and suspicious, and answered in monosyllables (R. 698). Despite these improvements, the November 3 note described Plaintiff as disheveled with an attitude and behavior that showed signs of being guarded, irritable mood, affect constricted, thought content is paranoia, insight and judgment poor, exhibiting signs of depression and psychosis evidenced by depressed mood, diminished interest in activities, significant weight loss, irritability, flat or inappropriate affect, paranoia, and exhibiting signs of abusing ETOH as evidenced by ignoring physical symptoms, and a disregard for social consequences (R. 699).

Dr. Sheehan opined in December 2015 that Plaintiff continued to present with signs of psychosis and signs of abusing ETOH, and noted that his speech was monotone, thought content paranoia, poverty of thought and affect blunted/flat (R. 699). Her diagnosis remained schizoaffective disorder, depressive type without good prognostic features (R. 699). Dr. Sheehan's January 26, 2016 note reveals that Plaintiff was doing well, his mood had stabilized since starting Innvega Sustenna injections (R. 702). He reported he drinks four beers a day but does not get intoxicated, and smokes one pack of cigarettes a day (R. 702). His mental status showed guarded behavior, euthymic mood, affect constricted, thought content appropriate, fair eye contact, poor insight and judgment (R. 702). On March 8, 2016, Dr. Sheehan indicated that Plaintiff "has a long history of untreated bipolar disorder and after he was no longer able to work, he decompensated and was hospitalized on multiple occasions" (R. 703). She described that he became very depressed and eventually agreed to treatment with long-acting injections that seem to effectively stabilize his mood so that he is no longer suicidal or in need of hospitalization (R. 703). She described that he continues to be socially withdrawn, appears somewhat disheveled, avoids eye contact and speaks monosyllables only when spoken to (R. 703). She opined that "[h]e

8

tries to do some part time work with a friend," but is "unable to hold down a full time job" as he is "disabled because of his mental illness" (R. 703).

Dr. Sheehan saw Plaintiff again on May 3, 2016 (R. 705) and on June 14, 2016 (R. 706). Again, Dr. Sheehan noted Plaintiff's appearance as disheveled with stained clothes and poor hygiene, that he is "unable to work because of his mental illness," and that he exhibited signs of psychosis and abusing ETOH (R. 705-706). Thereafter, Plaintiff transferred his care to another Gracepoint location where he treated with Ms. Parks in September and December 2016. Like Dr. Sheehan, Parks noted Plaintiff exhibited signs of depressed mood, diminished interest in activities, and a blunt affect with fair insight and judgment (R. 709-710). In September, Parks also noted signs of mania and psychosis evidenced by flat or inappropriate affect (R. 709).

In addition to failing to discuss a large portion of the Gracepoint treatment records and Dr. Sheehan's opinions, the ALJ erred in considering the two state agency consultants' opinions. The ALJ assigned "great weight" to the opinions of Theodore Weber, Ph.D., that Plaintiff had "moderate limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace" (R. 17). The problem is that Weber's assessment does not include these limitations. Instead, Weber concluded there was insufficient evidence to substantiate presence of a disorder and insufficient evidence to evaluate Plaintiff's claim. And Weber reached no conclusions regarding Plaintiff's functional limitations or RFC (R. 58-60, 65-66). Similarly, the ALJ assigned "little weight" to the other state agency consultant, Jessy Sadovnik, Psy.D., stating Sadovnik "noted insufficient evidence to make an assessment" (R. 18). But Sadovnik opined that Plaintiff was moderately limited in his ability to understand and remember detailed instructions; his ability to carry out detailed instructions, maintain attention and

9

concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; and his ability to perform at a consistent pace without an unreasonable number and length of rest periods (R. 84-85). Sadovnik also opined Plaintiff had social limitations affecting his ability to accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and had adaptation limitations affecting his ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others (R. 86). Despite these moderate limitations, Sadovnik opined that Plaintiff retains the ability to perform simple and repetitive tasks and to meet the basic mental demands of work on a sustained basis (R. 86). Because the ALJ erred by incorrectly reciting the limitations imposed by the state agency consultants, I cannot conclude that he adequately considered them. Remand is required for proper consideration of these opinions.

Now I transition back to Plaintiff's assertion that the ALJ failed to develop a full and fair record. The ALJ is charged with developing a full and fair record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). This obligation exists whether the claimant is represented by counsel or not. *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995); *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). When the Plaintiff demonstrates that the record reveals evidentiary gaps which result in unfairness or "clear prejudice," remand is warranted. *Brown*, 44 F.3d at 935; *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997) (stating that the claimant must show some prejudice before a court will order a remand to the Commissioner for further development of the record). Although the ALJ has a duty to develop the record, the ALJ is not

required to order a consultative examination as long as the record contains sufficient evidence upon which the ALJ can make an informed decision. *Ingram,* 496 F.3d at 1269 (citing *Doughty v. Apfel,* 245 F.3d 1274, 1281 (11th Cir. 2001)); 20 C.F.R. §§ 404.1527, 416.912, 416.919a; *Ford v. Sec. of Health & Human Services*, 659 F.2d 66, 69 (5th Cir. 1981)(Unit B). Rather, the regulations dictate that the ALJ may ask the claimant to attend a consultative examination at the Commissioner's expense, but only after the ALJ has given full consideration to whether any additional information needed is readily available from the records of the claimant's medical sources. *Doughty,* 245 F.3d 1280-1281; *See* 20 C.F.R.§§ 404.1512(d)-(f), 404.1519a(a)(1).[5] It is reversible error, however, for an ALJ not to order a consultative examination when such an evaluation is necessary for the ALJ to make an informed decision. *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984).

Because the ALJ failed to properly evaluate the medical evidence in the administrative record, it is unclear whether this is a situation where the record did not contain sufficient evidence upon which the ALJ could make an informed decision. Plaintiff argues that due to lack of insurance, he was unable to get needed physical and mental healthcare, necessitating both mental

---

[5] A non-exhaustive list of situations requiring a consultative examination appears at 20 C.F.R. § 404.1519a(b) and includes situations where (1) the additional evidence needed is not contained in the records of claimant's medical sources; (2) the evidence that may have been available from claimant's treating or other medical sources cannot be obtained for reasons beyond claimant's control, such as death or non-cooperation of a medical source; (3) highly technical or specialized medical evidence that the Commissioner needs is not available from claimant's treating or other medical sources; (4) a conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved, and we are unable to do so by re-contacting claimant's medical source; or (5) there is an indication of a change in claimant's condition that is likely to affect claimant's ability to work, but the current severity of claimant's impairment is not established. 20 C.F.R. § 404.1519a(b)(1)-(5).

and physical consultative examinations. As the ALJ explained in his opinion, Plaintiff's severe impairments include depression, bipolar disorder schizoaffective disorder and alcohol and substance abuse disorder (R. 12). But he found that Plaintiff's mental impairments did not prevent him from working so long as he is limited to work with SVP 1 or 2, simple, routine and repetitive tasks due to his moderate limitation in adapting or managing oneself. To work that requires occasional changes in work setting, and work with only occasional interaction with the public, supervisors and co-workers due to his schizo-affective disorder (R. 18). Because the ALJ failed to properly consider Plaintiff's medical condition as a whole, I cannot find that this RFC is supported by substantial evidence. Moreover, other record evidence tends to corroborate the records not discussed such as Plaintiff's hearing testimony and Annie Bower's Third Party Function Report. Bowers opined in January 2016, that Plaintiff sits around and talks to himself, walks up and down the road by his house talking to himself or someone that is not there (R. 238). She stated that before Plaintiff did "everything work, games ball and had a girlfriend was a real nice person" … now "Johnnie be looking at people hard and talking crazy to them so they don't want to be around him they don't know what he will do" (R. 239).

The Commissioner ordered a consultative examination; Todd Rosenthal, M.D. examined Plaintiff on June 3, 2015. Dr. Rosenthal noted that Plaintiff complained of intermittent foot pain, and after examination his assessment was that Plaintiff had both a history of a fractured toe and back pain (R. 324). Aside from Dr. Rosenthal's assessment and the state agency consultant Suzanne Johnson, D.O. who opined in February 2016 that Plaintiff had no physical impairments, the only other medical evidence concerning Plaintiff's physical condition are two exams at Tampa Family Health Clinic on December 17, 2014, and January 7, 2015. The ALJ noted in his decision

that "claimant testified that he has not been to the doctor or sought any treatment in quite some time and he is not currently on any medication" (R. 16). He concluded that "[t]he lack of treatment and the lack of medication usage suggest that the claimant is not as limited as claimed" (R. 16). Looking at the transcript of the March 2018 administrative hearing it is clear that Plaintiff testified he has difficulty standing, walking and sitting due to back pain and foot pain and that his pain in his back and feet have increased during the past two to three years (R. 45-48). But Plaintiff and his counsel advised that the lack of treatment is due to a lack of medical insurance. Indeed, in *Dawkins v. Bowen*, the Eleventh Circuit agreed that poverty excuses noncompliance with prescribed medical treatment. 848 F.2d 1211, 1213-1214 (11th Cir. 1988). Even the ALJ acknowledged that state agency consultant Sadovnik, whose assessment is dated February 17, 2016, "did not recently examine the claimant nor did he examine her [sic] most recent medical record" (R. 18). The most recent records Sadovnik reviewed was the Gracepoint outpatient note from January 2016 (R. 93) and as a state agency psychologist he did not examine Plaintiff. Against this backdrop, I find that on remand the ALJ should consider that Plaintiff was uninsured and its effect on his ability to obtain needed treatment. The ALJ should also consider whether the record is sufficient to allow him to make an informed decision, or whether additional consultative mental or physical examinations are needed. *See Good v. Astrue*, 240 Fed.App'x. 399, 404 (11th Cir. 2007) (citing *Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999)) (Where the record is sufficient for the ALJ to make an informed decision, the ALJ need not order an additional consultative examination.).

    *D. Conclusion*

    For the reasons stated above, it is ORDERED:

1. The ALJ's decision is REVERSED, and the case is remanded to the Commissioner for further administrative proceedings consistent with this Order; and

2. The Clerk of Court is directed to enter judgment for Plaintiff and close the case.

DONE AND ORDERED at Tampa, Florida on June 12, 2020.

*Mark A. Pizzo*
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE